UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> PATRICK DAI, <br><br>        Defendant. | Criminal No. 3:24-cr-160 (BKS) <br><br> **Government Sentencing Memorandum** |

**I.    Introduction**

The defendant is scheduled for sentencing on August 12, 2024, following his conviction by guilty plea to making a threat in interstate commerce, in violation of 18 U.S.C. § 875(c). The government agrees with the facts, statutory sentencing parameters, criminal history calculation, and guideline calculation set forth in the PSR. *See* Dkt. #35.

The defendant posted multiple times to the Cornell University Section of Website 1 threats to kill Jewish students attending Cornell University:

Post #1, entitled "jewish people need to be killed," was posted by "jew evil" on October 28, 2023, at 5:39 p.m., as follows:

- "if you see a jewish 'person' on campus follow them home and slit their throats. rats need to be eliminated from cornell."

Post #2, entitled "gonna bomb jewish house," was posted by "jews need death" on October 28, 2023, at 5:40 p.m., as follows (charged in Count 1):

- "gonna bomb jewish house in retaliation for the murder of 500 martyrs. You have been warned."

Post #3, entitled "watch out jews," was posted by "hamas soldier" on October 28,

2023, at 7:34 p.m., as follows:

> • "watch out pig jews. jihad is coming. nowhere is safe. your synagogues will become graveyards. your women will be raped and your children will be beheaded. glory to Allah."

Post #4, entitled "if i see another jew," was posted by "hamas" on October 29, 2023, at 11:24 a.m., as follows (charged in Count 1):

> • "if i see another jew on campus ... if i see a pig male jew I will stab you and slit your throat. if i see another pig female jew I will drag you away and rape you and throw you off a cliff. if i see another pig baby jew I will behead you in front of your parents. if i see another synagogue another rally for the zionist globalist genocidal apartheid dictatorial entity known as "israel", I will bring an assault rifle to campus and shoot all you pig jews. jews are human animals and deserve a pigs death. Liberation by any means. From the river to the sea, Palestine will be free!

Post #5, entitled "gonna Shoot up 104 West," was posted by user "kill jews" on October 29, 2023, at 3: 16 p.m., as follows (charged in Count 1):

> • "allahu akbar! from the river to the sea, palestine will be free! glory to hamas! liberation by any means necessary!"

See PSR ¶ 11.

The government respectfully requests that this Court sentence the defendant to a within guideline imprisonment term to be followed by 3 years of supervised release.

**II.     The Defendant's Objections To The PSR**

    **A.     The Defendant's Objection That The PSR Should Have Included His Explanation For Why He Made The Threats**

The defendant claims that the PSR should have reflected, in the acceptance of responsibility section, his explanation for why he made posts threatening to kill Jewish students (and exhorting others to do so). In sum and as the government understands it, the defendant says he made the threats as a kind of false flag attempt to cause backlash against Hamas and to engender sympathy for Jewish people. The government takes no position with respect to that request and does not believe that it has any impact on the guidelines calculation in this case.

    **B.     Defendant's Objection To The "Substantial Disruption" Enhancement In U.S.S.G. § 2A6.1(b)(4)(A)**

The defendant has objected to the application of a four-level "substantial disruption" enhancement pursuant to U.S.S.G. § 2A6.1(b)(4)(A), as recommended in the PSR.   (PSR ¶ 24). The enhancement was properly applied.

As set forth in detail in paragraph 16 of the PSR, as a direct result of the threats made by the defendant:

> Cornell University immediately installed security cameras at the Center for Jewish Living and 104 West and assisted with private security at three Jewish sorority and fraternity houses. Cornell University provided enhanced, around-the-clock security at campus locations where members of the Jewish community lived, gathered, and worshipped (which included off-campus locations), and the security was continued for extended periods of time – for between three to six weeks at the various locations. The director of the Jewish Studies Program and Near Eastern Studies immediately took steps to address expressed student and faculty fears about threats of violence by providing increased security in the campus building where those programs are located. The meeting locations for classes in those programs were also removed from the publicly available course roster, and Cornell University assisted faculty in relocating seven courses to different locations. In response to individual student and student organization requests, Cornell University removed the names of office holders in those organizations from publicly available sources. The student organization list (including a list of

3

members, scheduled events, and contact information) for Cornellians for Israel was also removed from publicly available sources by an administrator. Additionally, local law enforcement patrols continued at an elevated level at all affected locations, in addition to the enhanced security Cornell University Police provided to Jewish students and organizations on and off campus. Additionally, Cornell University cancelled classes on Friday, November 3, 2023, in response to the stress caused to staff and students by the threatening statements.

Just how disruptive the foregoing was to the classes themselves is detailed in a victim impact statement filed by one of the professors (*see* PSR at pp 24-25) who wrote in part:

> On the evening that the threats became known to the community, I received an email. All of my students had conferred. None of them felt safe. They asked if I would be holding class the next day. They were not sure if they should come to campus.
>
> I arranged for us to hold class that week in a room far across campus from the one we were officially scheduled to be in, a room with a lock on the door and no windows. This was enough for the students to feel like if we were targeted, we would not be easy to find. However, it also meant more walking time and so a slightly shorter class meeting, in a room without a decent projector for the lecture slides. In other words, it felt safe, but it also felt compromised. This had a negative effect on our pleasure and their learning.
>
> When the alleged perpetrator was caught and in custody, my students immediately felt some relief. However, they still wanted to hold class in the "safer" room for another day or two before we returned to our previous classroom. I believe their feelings about, and memories of, their college years will never be as free and easy as some people's. A sense of safety was shattered.

This degree of disruption rises to the level of substantial, warranting the enhancement. In a case involving a bomb threat to a university building that caused far less disruption, the 10th Circuit found application of the four-level "substantial disruption" enhancement pursuant to U.S.S.G. § 2A6.1(b)(4)(A) appropriate. *See*, *U.S. v. Anwar*, 741 F.3d 1134 (10th Cir. 2013). In *Anwar*, the defendant's threat to detonate a bomb at the New Mexico State University (NMSU) engineering building shut down the building, causing the evacuation of 240 people and the interruption of 14

classes. It also diverted various NMSU employees and police officers from their regular duties, six police officers and six firefighters swept the building searching for explosives before anyone could reenter the building, and campus authorities spent the next two days investigating before identifying the defendant as the suspect. The *Anwar* court held that these facts were sufficient to demonstrate an interruption to NMSU functions and services that were significant in scope and length to warrant the enhancement. *Anwar*, 741 F.3d 1134 at 1141.

Similarly, in *U.S. v. Dudley*, 463 F.3d 1221 (11th Cir. 2006) the 11th Circuit found that a defendant substantially disrupted public services, warranting the four-level enhancement, when he mailed packages containing what he claimed was anthrax to a state courthouse. That threat resulted in the closure of half a floor of the state courthouse for two hours. In addition, two people exposed to the letter were quarantined as the powder was being analyzed. Court proceedings of two judges were interrupted for several hours, and the judge who received the letter was provided around-the-clock security through the following day and had to spend "many hours" discussing the case with law enforcement. *Id.* at 1224-26.

The disruption caused by the defendant in this matter far exceeds the disruptions caused in either *Anwar* or *Dudley*. In *Anwar* and *Dudley* the disruptions could be measured in hours, not days. Similarly, the scope and number of people impacted by the threats in this case are much more substantial in terms of the number of students and faculty impacted and law enforcement resources dedicated to addressing the threats. This degree of disruption warrants the application of the four-level "substantial disruption" enhancement pursuant to U.S.S.G. § 2A6.1(b)(4)(A).

### C. Defendant's Objection To The 3-Level Enhancement For Hate Crime Motivation In U.S.S.G. § 3A1.1(a)

The three-level victim related adjustment pursuant to U.S.S.G. § 3A1.1(a) was also appropriately applied in this case notwithstanding the defendant's objection that, while his posted threats were intentionally directed at Cornell Jewish students because of their religion, his purported motivation at the time was to garner sympathy for Jewish people by exposing the atrocities of Hamas. Defendant admits that this is a "skewed" way of "thinking" but is asking the Court to take his word for it, offered of course after the fact, and not apply the enhancement.

The Second Circuit has made it clear that the Court does not have to discern the defendant's motivation in deciding whether the hate crime enhancement applies. A version of this exact same argument was advanced by the defendant in the case of *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) and rejected. In that case, the defendant argued that the application of the enhancement should not be applied as his political beliefs not hatred motivated his actions and the victims of the conspiracy were targeted based upon their U.S. citizenship, not their national origin. In rejecting this argument the Second Circuit held that:

> The line El–Hage draws between political activism and hate as the basis for the selection of his victims is a false distinction. It may be that some who choose their victims on the basis of their "actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation," U.S.S.G. § 3A1.1(a), do so for reasons that could be construed in some fashion as "political" in nature, and others do so for reasons more closely akin to blind, irrational hatred. Even assuming that a court could classify some motives as essentially "political" and others as rooted in "hatred," however, such a classification would be utterly irrelevant to the applicability of the hate crime enhancement. This is so because the enhancement does not turn on an evaluation of the considerations that motivated a defendant's decision to target victims based on their race, color, religion, or other enumerated characteristic. The hate crime enhancement applies if the defendant "intentionally selected any victim" on the basis of one of the factors listed above, §

> 3A1.1(a), and, because there can be no "good reasons" for doing so, the underlying motivation is simply beside the point. *Id*. at 154.

It is impossible for the Court or anyone other than the defendant to know for certain what truly motivated the defendant at the time he made his horrific posts but his self-serving post hoc claims that they were designed to garner sympathy for the group he was threatening repeatedly and in the vilest way imaginable is contradicted by both the threats themselves as well as the "apology" he issued after posting them. If, as the defendant now claims, his sole motivation was to spark outrage against Hamas and not to endanger any of his Jewish classmates, why ask others to carry out attacks?. Specifically, the defendant called on other people to attack his classmates when he posted on October 28, 2023, under the heading "jewish people need to be killed," "if **you** see a jewish 'person' on campus follow them home and slit their throats. rats need to be eliminated from cornell[.]" (Emphasis added.) This horrifying call to action made by the defendant clearly ran the risk of encouraging like-minded individuals to act upon these threats, which is inconsistent with a desire to create only backlash against Hamas and not expose the targeted group to physical danger.

Furthermore, the defendant's "apology" posted on October 29, 2023, makes no reference to his now claimed motivation and in fact belies this claim. In his "apology" post the defendant states that his behavior was:

> Shameful, calling for violence against people solely because of a cruel war a thousand miles away. Even more shameful because there is **no excuse for the targeting of innocent civilians, much less my classmates**.

This shows that the defendant targeted Jewish students because of their religion and perceived connection to Israel and as such warrants application of the enhancement.

### III.    Sentencing Recommendation

The defendant's conduct in this case was egregious and warrants a guideline sentence. The defendant terrorized a campus community for days and horrified the nation at a very volatile time. His threats were carefully designed to maximize the fear they would cause. For example, he posted from multiple usernames making it appear that Cornell students faced threats from numerous individuals who knew the campus well enough to target locations associated with Jewish student life. The specific threats he made against the Center for Jewish Living and Kosher Dining Hall caused a significant disruption to the university as a whole and, as noted in the victim impact statements, caused his classmates both emotional and psychological distress and shattered their sense of safety which is so vital to a healthy college environment.

Exacerbating the foregoing, the defendant called on others to perpetrate the most heinous crimes imaginable against his classmates and, although he now claims to not hold any animosity toward the Jewish community, his actions terrorized them, reflecting at best a callous disregard for how they would perceive the threatening posts.

He made these threats with full access to the community he was threatening. He made these threats at a time when he had access to a firearm and a katana-type sword, weapons which are all too frequently employed in terrorist attacks and hate crimes. (PSR ¶ 53).

He also made his postings anonymously and, when he did "apologize," that too was done anonymously with the defendant taking steps to hide his location and identity from authorities. Significantly, that "apology" was not made to the Jewish community he terrorized. In fact, there is not a single mention of the Jewish community in his apology. The fact of the matter is that the purported "apology" post appears to be more of an effort to make excuses for his behavior and

engender sympathy for himself and his family then to be a genuine expression of remorse for the harm he inflicted upon his classmates and the community.

The government understands that college can be a difficult time for young people and is not unsympathetic to the defendant's claims that he felt socially isolated and depressed. That said, many people go through periods where they feel isolated and/or depressed and lots of people face mental health challenges. Those tests and challenges do not give anyone the right to terrorize their neighbors and classmates. The government is hopeful that the defendant's purported new found insight into his mental health issues will allow him in the future to reengage with society in a healthy productive manner.

The government trusts that the Court will impose a sentence that takes into account all the harms caused by the defendant while also being designed to ensure his successful return to society.[1]

Respectfully submitted this 22nd day of July, 2024.

                                        CARLA B. FREEDMAN
                                      United States Attorney

                                      */s/ Geoffrey J.L. Brown*
By:  _____
        Geoffrey J.L. Brown (Bar Roll No. 513495)
        Michael Gadarian (Bar Roll No. 517198)
        Stephen Green (Bar Roll No. 507767)

---

[1] The government reserves the right to respond to defense arguments raised for the first time after the filing of this memorandum. Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond. *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

Assistant United States Attorneys