UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-                              CASE NO.  24-CR-160(BKS)

PATRICK DAI,
                    Defendant.

---

# **SENTENCING MEMORANDUM**

DATED: July 22, 2024               Respectfully submitted,

LISA A. PEEBLES
Federal Public Defender
Bar Roll No. 507041
Clinton Exchange, 3rd Floor
4 Clinton Square
Syracuse, New York 13202
(315) 701-0080

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................2

PROCEDURAL BACKGROUND..........................................................................5

OBJECTIONS TO THE PRESENTENCE REPORT ............................................5

    A.  U.S.S.G. § 3A1.1 does not apply because Patrick did not intentionally select *any* victim. ..................................................................................................6

    B.  U.S.S.G. 2A1.6(b)(4) does not apply because Patrick's posts did not substantially disrupt Cornell's business functions or services. ......................8

    C.  This Court should apply a two-level downward adjustment because Patrick is a "Zero-Point Offender." ..........................................................................11

    D.  In any case, no deference is owed to the Sentencing Guidelines. .................12

PATRICK'S BACKGROUND AND CHARACTERISTICS ...............................13

NATURE OF THE OFFENSE ............................................................................20

STATUTORY PURPOSES OF PUNISHMENT ..................................................22

CONCLUSION ...................................................................................................24

EXHIBITS (Filed as Attachments)
  Exhibit 1 – Transcript of Interrogation Excerpts
  Exhibit 2 – Email from Michael Kotlikoff, Ryan Lombardi, and Christine Lovely
  Exhibit 3 – School Records and Activities
  Exhibit 4 – Cornell Leave of Absence Request
  Exhibit 5 – Text Message Screenshot, Bing Liu and Patrick Dai, Oct. 20, 2023

LETTERS OF SUPPORT (Filed Separately)

VIDEOS (Submitted Separately)
  Clip 1a – Interrogation Excerpts of Patrick Dai, October 31, 2023
  Clip 1b, 1c, 1d – Interview of Patrick Dai
  Clip 2 – Interview of Bing Liu
  Clip 3 – Interview of Victor Wong
  Clip 4 – Interview of Bryan Harrison

# INTRODUCTION

The Hamas attack in Israel on October 7, 2023, and Israel's response, sparked an intense debate throughout the nation.  The campus of Cornell University was no different.[1]

Patrick Dai is pro-Israel.[2]  He became disturbed by the media's perceived bias against Israel,[3] especially a report from The New York Times[4] incorrectly attributing

---

[1]    Media coverage of the debate intensified by mid- to late-October.  *See, e.g.*, *Cornellians Mourn, Demand University Acknowledge Palestinians at Students for Justice in Palestine Vigil*, THE CORNELL DAILY SUN, Oct. 15, 2023, available at https://cornellsun.com/2023/10/15/cornellians-mourn-demand-university-acknowledge-palestinians-at-students-for-justice-in-palestine-vigil/; *Cornell University organize Pro Palestine rally*, WENY News, Oct. 19, 2023, available at https://www.weny.com/story/49861177/no-justice-no-peace-student-group-chapter-at-cornell-university-organize-pro-palestine-rally; *Cornell students hold same-day rallies in support of Palestinians and Israel*, THE ITHACA VOICE, Oct. 26, 2023, available at https://ithacavoice.org/2023/10/cornell-students-hold-same-day-rallies-in-support-of-palestinians-and-israel/; *Anti-Israel Graffiti, Rally for Palestine, Jewish Community Gathering: Week Roundup of Campus Israel-Palestine Demonstrations*, The Cornell Daily Sun, Oct. 27, 2023, available at https://cornellsun.com/2023/10/27/anti-israel-graffiti-rally-for-palestine-jewish-community-gathering-week-roundup-of-campus-israel-palestine-demonstrations/.

[2] *See* Video Thumb Drive, Clip 1a, Interrogation Excerpts of Patrick Dai, October 31, 2023, at 5:38:28 – 5:38:47; Exhibit 1, Transcript of Interrogation Excerpts ("I think if I did have a side, it would be, um, pro-Israeli, probably.  But yeah, that, that would be my side.  So.").

[3] *See* Video Thumb Drive, Clip 1a, Interrogation Excerpts of Patrick Dai, October 31, 2023, at 5:42:35 – 5:44:31; Exhibit 1, Transcript of Interrogation Excerpts ("So um, I guess again when I was reading the news I saw it was very . . . the coverage was still very unfairly biased against Israel. . . . Much of the media, like more liberal than not, has generally helped some very like, . . . I want to say, like, they have not been careful enough with their coverage. . . . the whole Israel coverage was really unfair.").

[4] *Editors' Note: Gaza Hospital Coverage*, N.Y. TIMES, Oct. 23, 2023, available at https://www.nytimes.com/2023/10/23/pageoneplus/editors-note-gaza-hospital-coverage.html.

the October 17, 2023 bombing of a Palestinian hospital to Israel.[5]   He was also concerned when some people at Cornell praised Hamas's October 7 attack[6] and called for the genocide of Jews and the destruction of the Jewish state.[7]   Patrick believed these individuals were wrong and naïvely supporting a terrorist organization.[8]

---

[5]   *See* Video Thumb Drive, Clip 1a, Interrogation of Patrick Dai, October 31, 2023, at 5:38:28 – 5:44:40; Exhibit 1, Transcript of Interrogation Excerpts ("They should have verified their sources more carefully, like.  The New York Times, CNN, and many other sources . . . especially like the reporting on the hospital.  Eventually . . . like before waiting to get confirmation from U.S. Intelligence from Israel.  Not from Israelis, but from like the U.K.'s intelligence, like even Canada, right. Like from independent sources from outside Israel and Palestine.  They didn't wait to verify like what.  They said, like, maybe it's an Israeli strike.  And sure they changed the headlines after.  But, like, people already started burning like synagogues and Israeli embassies and you can't really stop that after it's happened.  And so, like, . . . I thought that was really unfair an stuff and the whole Israel coverage was really unfair.").

[6] For example, a Cornell Professor said he was "exhilarated" by Hamas's attack on Israel. *See Cornell Professor "Exhilarated" by Hamas's Attack Defends Remark*, THE CORNELL DAILY SUN, Oct. 16, 2023, available at https://cornellsun.com/2023/10/16/cornell-professor-exhilarated-by-hamass-attack-defends-remark.

[7] *See* Video Thumb Drive, Clip 1a, Interrogation of Patrick Dai, October 31, 2023, at 5:45:15 – 5:45:28; Exhibit 1, Transcript of Interrogation Excerpts ("But yeah, I'd seen like, you know, there's been like protests like from the River to the Sea Palestine Will Be Free that is like a call for genocide and the destruction of the Jewish state.  People use that slogan.  Which they shouldn't."); *id*. at 5:46:01- 5:46:21 ("And then like there's been statements like endorsing like the Hamas attacks saying it's justified against, like, calling it justified against oppression.  Like, I don't think.  I thought, like, that wasn't right.  Yeah.").

[8] *See* U.S. Department of State, Designated Foreign Terrorist Organization, available at https://www.state.gov/foreign-terrorist-organizations/.

Although undiagnosed at the time, Patrick is also autistic.[9]  He falls in the less than one percentile in adaptive functioning: communication, socialization, and daily living skills.

In a misguided attempt to highlight Hamas's genocidal beliefs and garner support for Israel, Patrick culled hateful and antisemitic language from the internet (that he also found repugnant) and made several posts on a campus-related website in the guise of an antisemite Hamas extremist.  He believed, wrongly, that the posts would prompt a "blowback" against what he perceived as anti-Israel media coverage and pro-Hamas sentiment on campus.[10]

Patrick's flawed logic is a result of his autism. His intentions were the exact opposite of the public's perception. Patrick is not antisemitic and is not violent. His developmental disabilities, in combination with his otherwise good character and the circumstances surrounding the offense conduct, warrant a sentence of time served so that he can begin to receive the structured services he needs through the New York Office for People with Developmental Disabilities.

---

[9] *See* Dr. Bryan Harrison's neurobehavioral and psychological report, dated February 16, 2024, attached to the PSR as Appendix B.

[10] *See* Video Thumb Drive, Clip 1a, Interrogation of Patrick Dai, October 31, 2023, at 5:44:40 – 5:45:03; *id*. at 5:46:20 – 5:46:35; Exhibit 1, Transcript of Interrogation Excerpts ("And I thought like if I, you know, published something that's, like, sort of shows like what Hamas believes in and, like, then people would, like, realize, maybe there'd be some blow back and they'd like, you know, realize, realize, I guess."); *id*. ("So, I thought if maybe I could get some people to see what it actually was.  What Hamas actually believes in, you know, there'd some blowback.  But of course I wasn't thinking the right way.  Yeah.").

## PROCEDURAL BACKGROUND

Patrick entered a guilty plea to Making a Threat Using Interstate Communications, in violation of 18 U.S.C. § 875(c). He is scheduled for sentencing on August 12, 2024.

Patrick's adjusted offense level should be 12, minus 2 levels for acceptance of responsibility. More accurately, his advisory range is 6 to 12 months. By August 12, 2024, Patrick will have served nearly 10 months in the county jail. Based on the circumstances of this case and the 18 U.S.C. § 3553(a) factors, a time served sentence is more than sufficient to satisfy the statutory purposes of punishment.

## OBJECTIONS TO THE PRESENTENCE REPORT

A Presentence Report was filed on July 10, 2024, to which defense counsel has several objections. Probation calculated Patrick's adjusted offense level at 21, minus 3 for acceptance of responsibility, for a total offense level of 18. He has no criminal history.  Therefore, his advisory range, according to the PSR, is 27 to 33 months.

The defense maintains that Probation's advisory guideline calculations are incorrect. Specifically, the defense objects to a 4-level enhancement for a substantial disruption of public, governmental, or business function pursuant to U.S.S.G. § 2A6.1(b)(4), and the 3-level victim related adjustment pursuant to U.S.S.G. § 3A1.1.(a).  The offense level should also be reduced by two levels pursuant to

5

U.S.S.G. § 4A1.3 because Patrick is a "Zero-Point Offender."  In any case, this Court should decline to give the Guidelines any deference following *Loper Bright*.

### A.   U.S.S.G. § 3A1.1 does not apply because Patrick did not intentionally select *any* victim.

As relevant here, 3A1.1(a) applies if the court at sentencing determines beyond a reasonable doubt that the defendant "intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person."  A version of this enhancement was added pursuant to the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322 § 280003(b), in which Congress directed the Sentencing Commission to promulgate an enhancement "for offenses that the finder of fact at trial determines beyond a reasonable doubt are hate crimes."  The legislative history of the Hate Crimes Sentencing Enhancement Act states: "In order to constitute a hate crime, the selection of a victim . . . must result from the defendant's hate or animus toward any person for bearing one or more of the characteristics set forth in the definition of 'hate crime.'"[11] The purpose of §3A1.1(a) is to punish those who have a hate crime motivation and to deter future hate crimes.[12] Congress also directed the

---

[11] H.R. Rep. No. 103-244, at 5 (1993).

[12] *See United States v. Armstrong*, 620 F.3d 1172, 1176 (9th Cir. 2010).

Sentencing Commission to "take into account any mitigating circumstances that might justify exceptions" to the enhancement.[13]

The Sentencing Commission adopted the enhancement in 1995. The enhancement both broadened and narrowed the directives of Congress in two important ways. First, the Sentencing Commission extended the enhancement to cases "of a guilty or nolo contendere plea." According to the Sentencing Commission, this extension was added to "avoid unwarranted sentencing disparity based on the mode of conviction."[14] The Commission failed to acknowledge, however, the reduced evidentiary and procedural safeguards surrounding guilty please. Second, the Sentencing Commission failed to acknowledge or incorporate "mitigating circumstances that might justify exceptions."

The Sentencing Commission also amended the enhancement in 1997. As relevant here, the amendment clarified Congress's intent "to punish a defendant whose primary objective in committing the hate crime was to harm a member of a particular class of individuals."[15]

The hate crime enhancement does not apply in this case. As he told law enforcement on October 31, Patrick's intention was to garner sympathy for Jewish

---

[13] Pub. L. 103-322 § 280003(b).

[14] U.S.S.G. App'x C, Amendment 521, Reason for Amendment.

[15] U.S.S.G., App'x C, Amendment 564, Reason for Amendment.

people, not to harm them. His primary objective was to expose the atrocities of the Hamas terrorist organization. Patrick's mother studied in Israel, and his family has close Jewish friends. Patrick respects Judaism, celebrates Passover, and eats Jewish food. While his thinking was certainly skewed when he cobbled together the vile posts he sent, his objective was not to hurt the Jewish community, but rather to gain sympathy for the Jewish plight from pro-Palestinian groups. Patrick has never felt or expressed hatred or malice toward Jewish people. His fondness for Jewish people prompted him to want to help them.

The government has offered no evidence to the contrary.  And not for lack of trying.  Law enforcement agents held Patrick in an interrogation room for more than seven hours.  They combed through his digital devices.  Yet, the government has produced no evidence that Patrick intentionally sought to harm anyone.  Because Patrick did not intentionally select any victim, much less one falling within a protected class, the three-level enhancement of §3A1.1 does not apply.

**B.      U.S.S.G. 2A1.6(b)(4) does not apply because Patrick's posts did not substantially disrupt Cornell's functions or services.**

The defense also objects to the 4-level enhancement set forth in paragraph 24 that suggests Cornell University business was substantially disrupted. The basis for this enhancement states that Cornell University closed for one day, November 3, 2023. That claim is misleading and factually inaccurate as it pertains to Patrick. Patrick's offense ended on Sunday, October 29, 2023, when Patrick retracted the

posts by issuing an apology.[16]   That evening, after learning of Patrick's posts, Cornell President Martha Pollack met with Jewish students at the Center for Jewish Living[17] and issued a statement denouncing the posts and assuring students threats of violence are intolerable.[18]   President Pollack also noted that "[i]t was so heartening to spend time with our students, who expressed strength and resilience even in the face of these awful threats."[19]   Classes resumed as normal on Monday, October 30, 2023.   Indeed, Patick was arrested while leaving class on Tuesday, October 31, 2023.   On that date, he admitted sending the posts, he explained his reasoning, and was held in custody. He had been attending classes before anyone knew who sent the messages.

On November 1, 2023, Cornell University sent an email announcing school closure on November 3, 2023.[20] The email was addressed to both the Ithaca and

---

[16] *See supra*, at 20.

[17] Statement by Cornell President Martha E. Pollack, *Standing against antisemitism and all forms of hate*, Oct. 31, 2023, available at https://statements.cornell.edu/2023/20231101-standing-against-hate.cfm.

[18] Statement by Cornell President Martha E. Pollack, *Antisemitic threats to our community*, Oct. 29, 2023, available at https://statements.cornell.edu/2023/20231029-antisemitic-threats.cfm *Standing against antisemitism and all forms of hate*.

[19] Statement by Cornell President Martha E. Pollack, *Standing against antisemitism and all forms of hate*, Oct. 31, 2023, available at https://statements.cornell.edu/2023/20231101-standing-against-hate.cfm.

[20] *See* Exhibit 2, Cornell Email from Michael Kotlikoff, Ryan Lombardi, and Christine Lovely.

Geneva campus communities: "In recognition of the extraordinary *stress of the past few weeks*, this Friday, November 3, will be a community day.  No classes will be held, and faculty and staff will be excused from work, except for employees who provide essential services."[21] Of particular note, the email does not mention Patrick or his posts.  Nor does the email indicate that the closure was necessary to address the threats contained in his posts.  Instead, the email references events stretching back several weeks, well before Patrick's posts, and cites the stress of those events.[22] Moreover, the purpose of the "community day" was intended to allow the campus community "restorative time to take care of yourselves and reflect on how we can nurture the kind of caring, mutually supportive community that we all value."[23] Finally, the security measures and accommodations referenced in paragraph 16 of the Presentence Report were made by Cornell to *continue* its functions and services. Therefore, it cannot be said that the business function of the university, class instruction, and research, were substantially disrupted. This enhancement is not justified based on the facts of this case.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

**C.    This Court should apply a two-level downward adjustment because Patrick is a "Zero-Point Offender."**

Patrick satisfies the criteria of U.S.S.G. § 4C1.1 for a two-level downward adjustment for so-called zero-point offenders:

(1)    He has no prior arrests, much less criminal history points.

(2)    He did not receive an adjustment under §3A1.4 (Terrorism).

(3)    He did not use violence or credible threats of violence in connection with the offense.  The Sentencing Commission did not define the word "credible," but its ordinary definition means "offering reasonable grounds for being believed or trusted" and "good enough to be effective."     Credible, Meriam-Webster, available at https://www.merriam-webster.com/dictionary/credible. Patrick's intent was never to instill fear in the recipient.  He sought merely to demonstrate Hamas's extremism.  His posts were akin to political speech.  Therefore, he did not intentionally use a credible threat of violence, and Cornell continued its education mission without disruption.  At most, Patrick acted in reckless disregard of the fact that the posts would be perceived as a true threat.  Moreover, the threatening language contained in the posts were the offense.  They were not "in connection with the offense," as required by this criterion.

(4)    The offense did not result in death or serious bodily injury.

(5)    The instant offense of conviction is not a sex offense.

(6)    Patrick did not personally cause substantial financial hardship.

(7)    No firearm or dangerous weapon was connected to the offense.

(8)    The offense is not covered by §2H1.1 (Offenses Involving Individual Rights).

(9)    Patrick should not receive an adjustment under §3A1.1 (Hate Crime Motivation) or §3A1.5 (Serious Human Rights Offense).

(10)   Patrick did not receive an adjustment under §3B1.1 (Aggravating Role) and was not involved in a continuing criminal enterprise under 21 U.S.C. § 848.

**D.   In any case, no deference is owed to the Sentencing Guidelines.**

Although the Supreme Court has never addressed the level of deference owed to the Sentencing Guidelines themselves, several Justices have suggested that so-called Chevron deference (from *Chevron U.S.A. Inc v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)) applies.[24]

The Supreme Court just overturned *Chevron*.  In *Loper Bright Enterprises v. Raimondo*, 603 U.S. __, 144 S.Ct. 2244 (June. 28, 2024), the Supreme Court held that courts may no longer defer to an agency's interpretation of the law simply because a statute is ambiguous.  Courts are now free to ignore the Sentencing Guidelines.

Congress created the Sentencing Commission as part of the Sentencing Reform Act.  The Sentencing Commission was tasked with creating mandatory Guidelines that interpret and implement the conflicting and ambiguous sentencing

---

[24] *See*, *e.g.*, *United States v. Labonte*, 520 U.S. 751, 763 (1997) (Breyer, J., dissenting with whom Stevens and Ginsburg, JJ., join) ("[W]e should defer to the Commision's views about what Guideline the statute permits it to write; and we should uphold the Guideline the Commission has written because it 'is based on a permissible construction of the statute.'"); *United States v. Shabazz*, 933 F.2d 1029, 1035 (D.C. Cir. 1991) (Thomas, J.) ("We may set aside the guideline, therefore, only if it contravenes an 'unambiguously expressed intent of Congress' or is unreasonable.").

goals set forth in 18 U.S.C. § 3553(a).[25]  However, the Sentencing Guidelines are no longer mandatory following *United States v. Booker*, 543 U.S. 220 (2005).  Yet, Congress and the Sentencing Commission have failed to redesign the advisory Guidelines.  As a consequence, the Guidelines no longer fulfill their purpose of providing certainty and uniformity.  Indeed, less than half of all defendants are sentenced within the Guidelines.[26]  And many of the individual Guidelines, including the challenged ones here, are no longer (if they ever were) based on empirical evidence, leading to irrationally long guideline ranges that have contributed to over-populated prisons, in violation of 28 U.S.C. § 994(g).  Therefore, this Court should decline to give the Sentencing Guidelines any deference in this case.

## PATRICK'S BACKGROUND AND CHARACTERISTICS

Patrick was born in 2002. His birth presented challenges and the doctor had to use vacuum extraction to assist in his delivery. Since birth, he lived with his parents and younger brother in an affluent suburb near Rochester, New York. As a

---

[25] *See* U.S.S.G., Chapter One, Part A ("The Sentencing Reform Act of 1984 (Title II of the Comprehensive Crime Control Act of 1984) provides for the development of guidelines that will further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation. The Act delegates broad authority to the Commission to review and rationalize the federal sentencing process.").

[26] *See* U.S. Senencing Comm'n, 2023 Sourcebook of Federal Sentencing Statistics, Tbl. 29, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023_Sourcebook.pdf.

toddler, Patrick struggled with potty training, was a picky eater and was particularly sensitive to light and sounds. He rarely slept through the night. For an extended period, he only ate steamed rice and rice porridge.

As a young child, Patrick enjoyed playing with Legos and Minecraft. He also had a fascination with the TV cartoon "SpongeBob SquarePants" at a young age. His enduring fondness for the show, even as he grew older, often puzzled those around him. Sometimes, his elementary school peers playfully called him "Patrick Star," in reference to a character in the show. He maintained an affinity for movies and TV shows meant for younger audiences, and his attachment to "SpongeBob" persisted even into his college years.

Patrick attended the Pittsford-Mendon public schools. He's had a passion for history since childhood, and he's dedicatedly read history-related books, memorizing extensive passages that few others care about. At the age of 9, while his family was at the airport for vacation, he was engrossed in a massive history book, leaving onlookers curious about his understanding. His response was simple—he just loves reading history. Unfortunately, when he engages in conversation, he often unknowingly steers it toward historical topics, unintentionally boring the listener. He's a walking encyclopedia and speaks with a scholarly air. While he was able to master history and his schoolwork, he was extremely gullible when it came to interacting with his classmates.

According to Patrick's mom, when he was 9 years old, she received a call from the school to pick him up because he had wet his pants. When they got home, his mom asked why, but he didn't respond. Over the following week, every day, his mom was called by the school to pick him up because he wet his pants. She was extremely worried and took him to his pediatrician, but no issues were found. The pediatrician then suggested a visit to a urologist, who also found nothing wrong but recommended to have a surgery to see if he would get better. His parents hesitated about such a procedure at his young age. That night, his mom spent a long time carefully talking to him, gradually asking why he kept wetting his pants. He finally confessed that it was because a classmate had told him, "If you hold your pee, you'll die." His mom was shocked, spending a long time explaining to him that his classmate was just teasing him.

Patrick also had difficulty with changes in schedules or assignments. Once, in an English class, the teacher informed everyone that they should write an essay about cars the next day. He was very excited. However, the next day, the teacher changed the essay topic to animals. Patrick became extremely frustrated and anxious, believing the teacher shouldn't have changed the topic suddenly. He adamantly refused to listen to the teacher's advice and refused to write. In the end, the teacher warned him that if he didn't write, he would receive a score of zero for the assignment. Despite his extreme frustration and anxiety, Patrick still didn't write. As

15

a last resort, the teacher contacted his mother, allowing him to choose his own topic and complete the essay later that evening. When he returned home, after his mother's lengthy counseling, he realized that his disrespect toward the teacher was wrong. So, he took another extreme approach. He sat still in his chair for three hours and wrote an extremely long essay. He told his mother that doing this was his way of correcting his mistake and making it up to the teacher.

Patrick's aversion to change also impacted his attire. He hates trying on new clothes and prefers to wear them until they're worn out and have holes in them. Regardless of the weather, he wore the same jacket from summer through winter. His mom had to prompt him to change according to the weather.

His mom reports that Patrick has always avoided making eye contact while talking to others. He nervously picks at his fingers when he talks. He finds comfort in holding a small ball. He hums often, as if it's second nature to him. When he walks, he looks at the ground or in other directions, never initiating eye contact. His father, troubled by his lack of social skills, reprimanded Patrick whenever he looked away while talking to or greeting people.

As described in letters of support from family members, family friends, and school friends,[27] Patrick is an intelligent and kind young man. He received straight

---

[27] *See* Letters in Support, separately filed.

A's throughout elementary, middle, and high school, participated in extracurricular activities, including tennis and Science Olympiad.[28] He earned a perfect score on his ACT exam.[29] Patrick was also on the tennis team, although his mom reports he was clumsy and uncoordinated.[30]

Although Patrick hadn't been diagnosed with autism prior to college, his condition would be obvious to anyone who ever interacted with him. He is a soft-spoken, quirky, and kind person. It is abundantly clear that his classmates and teachers saw him as a kind and considerate young man.[31] They recognized Patrick was different. He has always been known to be a calm person who rarely raised his voice. He has never displayed any violent tendencies, nor has he ever acted aggressively toward anyone. His classmates report that Patrick was bullied in high school by several students, but he never realized that was what was happening. His friends in high school were mostly Asian-Americans, and they looked out for him. They acted as his support system and reported any mistreatment of Patrick to the administration because he wasn't aware of what was happening.

---

[28] *See* Exhibit 3, School Records and Activities, at 11-13 (Yearbook Photographs from Club Participation in Masterminds, Math League and Stem Club).

[29] *See* Exhibit 3, School Records and Activities, at 6 (ACT Scores).

[30] *See* Exhibit 3, School Records and Activities, at 14-15 (Tennis Team Photographs).

[31] *See* Letters of Support.

Patrick struggles to process information and adjust to the complexities of social interaction. His developmental delays led to difficulties with flexibility and adjustments to change. These deficits were exacerbated when he was left to fend for himself at Cornell.

Following his high school graduation in 2020, Patrick was looking forward to attending his dream school at Cornell. Then the pandemic hit. Although Patrick was still able to attend Cornell, the pandemic made that experience different than he had expected. He became isolated from others and depressed. He began to struggle with things that had always been easy for him, like completing schoolwork and turning it in on time. Finally, in September 2022, he requested and received a leave of absence from Cornell to seek mental health treatment.[32] For the next year, he received outpatient mental health treatment. He was diagnosed with major depressive disorder.

During the summer of 2023, Patrick tried Door Dash to earn money. He made two deliveries then quit. He was overwhelmed with anxiety because he could not properly communicate with his customers. This is one example of the difficulties Patrick faced when he tried interacting with people he didn't know. His ability to think and reason in everyday situations is impacted by his having an autism-

---

[32] *See* Exhibit 4, Leave of Absence Request.

spectrum disorder, and his adaptive behavior scores indicate a need for support with communication, daily living, and socialization.[33]

He was prescribed an anti-depressant medication during the summer of 2023. Patrick had complained to his family that the medication was making him feel worse.

In August 2023, Patrick returned to Cornell and moved into an apartment. His ability to reason and problem-solve socially had already declined during his transition back to living on campus.

During that fall, Patrick had suicidal thoughts and gestures. However, given his developmental disability, he is not capable of carrying out suicide. He didn't know how to ask for help.

On Friday October 20, 2023, the following text exchange occurred between Patrick and his mom:

Patrick:     "i dunno what im doing rn."

                    "maybe Zoloft is motivating me but just the opposite way."

                    "or maybe im a little crazy and thinking too much."

                    "this wasn't supposed to go this way."

                    "what happened to me."

                    "im ok."

---

[33] *See* Dr. Bryan Harrison's neurobehavioral and psychological report, dated February 16, 2024, attached to the PSR as Appendix B.

Bing Lui:     "If it doesn't work well, we could switch to another medicine."

"Just calm down first."

"I could pick you up earlier if you want?"[34]

Less than a week later, Patrick found himself obsessing about a factually incorrect article in the New York Times coverage of the war in Israel. He also heard a Cornell professor during a rally espousing sympathy for Hamas. This bothered Patrick a great deal. He wanted people to understand Hamas is a terrorist organization with no regard for Jewish lives. He concocted a plan, hoping to convince Hamas sympathizers to abandon their stance.

## NATURE OF THE OFFENSE

Patrick's arrest and the allegations against him are a shock to those who know him best.[35] He is charged with making a series of threatening social media posts for during a 24-hour period from October 28 to October 29, 2023.[36] The posts contained vile and violent language about Jewish people.  The posts were deleted soon after they were posted.

A few hours later, Patrick posted this apology:

---

[34] *See* Exhibit 5, Text Message Screenshot, Bing Liu and Patrick Dai, Oct. 20, 2023.

[35] *See* Letters of Support.

[36] *See* Criminal Complaint, Dkt. No. 1.

**I am sorry it was my fault alone**

To all cornellians,

Apologies. There is no room for divisive statements in person or online. I am sorry. A lesser man would try to hide behind a mask and that is exactly what I did. Shameful, calling for violence against people solely because of a cruel war a thousand miles away. Even more shameful because there is no excuse for the targeting of innocent civilians, much less my classmates.

I spent a few hours reflecting alone today. I asked myself "What could have led me up to this point?", "Why didn't I have enough self control?" "If I had gotten more mental counseling would it have been better?". But there is no excuse. No amount of depression or loneliness or isolation is an excuse for terror or terroristic threats.

I should own my actions and the fault is wholly mine. Not some nation a thousand miles away, not some other nation a thousand miles away, but me alone. I should not have pressed send on a comment on a conflict I had no standing to talk about, but I did. I understand the consequences. Expulsion from school and a permanent criminal record. I will get my worldly things and affairs in order before I go to prison for the rest of my life.

Sincere regards,
A depressed suicidal person

P.S. once it gets on the news please dont mock my parents or acquaintances or other family members too much they weren't the ones responsible it was all me

Posted By: I am sorry
Oct 29, 2023 7:51:59 PM

No further posts appeared between October 29 and Patrick's arrest on October 31.

The circumstances and intent surrounding Patrick's post on the Greek Life social media site, though not adequately accounted for by the Sentencing Guidelines, cannot be overlooked when fashioning an appropriate sentence. By this point in the semester, his mental health difficulties with depression had so fully depleted him that he acted in a way that was completely out of his normal, mild-mannered character and social naivete. His belief and intent at the time of these posts was to present himself in the guise of a pro-Hamas extremist in a way that would further foment action in defense of the Jewish community. This pattern of convoluted and distorted logic, coupled with Patrick's deficits in perspective-taking and social reasoning, led him to believe that his posts would be helpful in garnering sympathy for the Jewish community.

## STATUTORY PURPOSES OF PUNISHMENT

The sentencing court is required to consider the advisory sentencing guideline range along with the statutory factors set forth in 18 U.S.C. § 3553(a). Specifically, (1) the offense and offender characteristics; (2) the need for the sentence to reflect the basic aims of sentencing, namely, (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. 18 U.S.C. § 3553(a); *see also Rita v. United States,* 551 U.S. 338, 347-48 (2007). Here, each of these factors cry out for a sentence of time served.

Patrick is truly sorry for the pain he caused, particularly to his family. He doesn't believe he deserves any sympathy or leniency. But there is no question that he certainly does.

As Dr. Bryan Harrison noted in the attached report, incarceration would not have the same intended effect for Patrick as for another inmate, due to his being on the autism spectrum.[37]

Patrick is not your typical offender. The circumstances under which he created the posts was certainly not to foster antisemitism, but rather the opposite. He is not

---

[37] *See* Dr. Bryan Harrison's neurobehavioral and psychological report, dated February 16, 2024, attached to the PSR as Appendix B, at 6.

a danger to the Jewish community, nor anyone else. He is a young man who operates socially at the level of a child between the ages of 5 and 10. Dr. Harrison is willing to work with Patrick upon his release from custody. Dr. Harrison specializes in connecting autistic people to the services and support they require to function in the community. Dr. Harrison believes that Patrick qualifies for services through the Office of Persons with Developmental Disabilities.[38]  Autism Spectrum Disorder is a developmental disability that allows for wraparound care coordination waiver services.  He would be eligible for lifelong access to a wide array of state-funded supportive services, including housing support, employment services, family support services, assistive technology, habilitation support, and respite.  Patrick has already begun the enrollment process through Southern Tier Connect.  Dr. Harrison has agreed to coordinate care for Patrick and his family. He has set forth in detail his recommendations for Patrick so that he can continue to grow and develop.[39]

---

[38] *Id*. at 6.

[39] *Id*. at 6.

**CONCLUSION**

For the reasons set forth above, Patrick is deserving of leniency and a sentence of time served.

DATED: July 22, 2024                    Respectfully submitted,

                                        */s/*
                                        Lisa A. Peebles
                                        Federal Public Defender
                                        Bar Roll No. 507041
                                        Clinton Exchange, 3rd Floor
                                        4 Clinton Square
                                        Syracuse, New York 13202
                                        (315) 701-0080